UNITED STATES of America

v.

Kenneth E. HARRIS, Aviation Electrician's Mate Second Class (E–5), U.S. Navy.

NMCCA 200401897.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 15 Jan. 2004.

31 July 2008.

For Appellant: Capt S. Babu Kaza, USMC; Capt R. Sanchez, USMC.

For Appellee: Maj Wilbur Lee, USMC; LT Derick D. Butler, JAGC, USN.

Before O'TOOLE, Chief Judge, VINCENT, Senior Judge, and COUCH, Appellate Military Judge.

## PUBLISHED OPINION OF THE COURT

O'TOOLE, Chief Judge:

This matter is again before this court, pursuant to the order of our superior court, to review an administrative file that contains the disposition of the appellant's ethics complaint against a Government counsel. We are then to reconsider the appellant's motion

to reconsider and motion to recuse our predecessor panel, including Senior Judge Geiser, who was formerly the Director of the Administrative Law Division (OJAG Code 13) at the time the appellant's ethics complaint against a Navy judge advocate was initially processed by that division. *United States v. Harris*, 65 M.J. 485 (C.A.A.F.2007).

Contrary to his pleas, the accused was convicted by a special court-martial, with enlisted representation, of wrongful use of methamphetamines, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. The appellant was sentenced to 3 months confinement, forfeiture of $795.00 pay per month for a period of 3 months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority approved the sentence as adjudged. Our predecessor panel affirmed the appellant's conviction. *United States v. Harris*, 65 M.J. 594 (N.M.Ct.Crim.App.2007).

Following initial appellate review, the appellant moved to recuse the original court panel, alleging a conflict by Senior Judge Geiser, the lead judge. The appellant also imputed the alleged conflict to the other judges of the panel. His motion was summarily denied by the original panel, as were his motions for panel and *en banc* reconsideration. *United States v. Harris*, No. 200401897, unpublished order (N.M.Ct.Crim. App. 20 Feb 2007).

Our superior court found an abuse of discretion in denying these motions without first having reviewed the Code 13 administrative file. The order returning this matter directs reconsideration of the appellant's motions by a new panel, after that panel has reviewed the Code 13 file related to the appellant's allegations.[1]

We have examined the entire record of trial, the appellant's briefs, the Government's responses, and the administrative file disposing of the appellant's ethics complaint. Because we have granted the appellant's motion to reconsider as a matter of our discretion, we have re-examined his originally assigned errors.[2] We conclude that the findings and sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## Background

The facts of this matter are somewhat lengthy. We, therefore, begin with a brief background description, and we will recite additional facts as needed to address allegations of error in subsequent sections of this opinion.

In February 2003, the appellant was seen digging in his neighbor's yard, in the rain, dressed only in shorts. The local police arrested him, and took him to the police station. The appellant's command was notified and sent several personnel, including a corpsman, to retrieve the appellant. Those command personnel noted that the appellant was agitated, and that he was making strange statements, such as he was "digging for diamonds" and someone was trying to kill him. In route to the local hospital, he admitted ingesting methamphetamine. He repeated his strange story to the civilian hospital personnel and remained highly agitated during his treatment at the emergency room. He also admitted to the emergency room nurse that he had eaten methamphetamine.

Upon return to his command after his hospital treatment, the appellant was direct-

---

1. The current panel of this court is composed of judges who did not participate in the prior panel decision or in the prior denial of the motion for en banc reconsideration.

2. The appellant originally filed five assignments of error: 1) that the military judge erred when he found beyond a reasonable doubt that there was no unlawful command influence or witness interference; 2) that prosecutorial misconduct rendered his trial unreliable and unfair; 3) that the staff judge advocate's recommendation and convening authority's action are defective because

they fail to mention and consider clemency; 4) that excessive post-trial delay requires relief; and 5) that the admission into evidence of documents relating to his positive urinalysis violated his Sixth Amendment Right to Confrontation. In addition, the appellant's Motion for Panel and *En Banc* Reconsideration of the original opinion claimed that a portion of that opinion could force an alteration of the standards for effective and zealous advocacy by appellate defense counsel. Because the original opinion was vacated, that issue is moot, and need not be addressed further.

ed to provide a urine sample. When the appellant's urine tested positive for methamphetamine, his commanding officer initiated administrative separation board proceedings. During the course of these proceedings, the appellant complained that the Navy judge advocate representing the Government, LT C, had intimidated a defense witness, Mr. Foster, into recanting a statement in which he had admitted putting methamphetamine in the appellant's drink without the appellant's knowledge. Following the retraction by his witness, the appellant demanded trial by special court-martial. The commanding officer accommodated that demand, terminated the administrative board processing, and referred the case to a special court-martial with two Navy judge advocates as prosecutors, neither of whom was LT C.

At trial, the appellant again raised allegations of misconduct by LT C, and he sought to block the Government's introduction of Mr. Foster's retraction. The military judge ruled against the appellant and admitted both of Mr. Foster's statements. Still in the midst of trial, the appellant filed an ethics complaint against LT C. That complaint, forwarded in accordance with governing directives to OJAG Code 13, included a 30–page document in which the appellant described the proceedings of his special court-martial up to that date, and he once again alleged witness intimidation by LT C, among other misconduct.

## I. Recusal

### A. Additional Facts

As noted, ethics complaints against Navy judge advocates are submitted to OJAG Code 13 for processing. The OJAG Code 13 Ethics Branch Head receives and assembles documentation to complete the administrative package for action by the Division Director or his senior, the Rules Counsel, or by the Judge Advocate General, depending on the nature of final action. At the time the appellant submitted his complaint, Lieutenant Commander Barbara Hanna, JAGC, USN, was the Ethics Branch Head; Captain Eric Geiser, JAGC, USN, was the Director, Administrative Law Division; and Captain Jane Dalton, JAGC, USN, was Rules Counsel.

The appellant's assertion that Senior Judge Geiser was "deeply involved in the appellant's case" is simply not supported by the Code 13 file. Appellant's Supplemental Brief of 22 Jan 2008 at 4. Captain Geiser's personal role in the processing of the appellant's ethics complaint can be succinctly described as having included two actions: first, in his capacity as Division Director, he forwarded to the Rules Counsel the preliminary package assembled by Lieutenant Commander Hanna with a memo "concurring" with her recommendation that an ethics investigation should be conducted; and second, at the request of the Rules Counsel, Captain Geiser issued a letter, which he signed "by direction," appointing a senior officer in the geographic area of the complaint to conduct an investigation into its merits. Captain Geiser then detached from the Administrative Law Division and joined this court. His successor and the successor Rules Counsel received the results of the investigation months later and took final action, dismissing the appellant's complaint.

### B. Principles of Law

■ Ordinarily, recusal decisions are made by the judge who is the object of a motion to recuse. 28 U.S.C. § 455 provides for specific circumstances under which a military Service court of criminal appeals judge "shall disqualify himself." *United States v. Lynn*, 54 M.J. 202, 205 (C.A.A.F.2000)(citing *United States v. Hamilton*, 41 M.J. 32, 39 (C.M.A.1994)(applying 28 U.S.C. § 455 to Service court judges)). Once made, a recusal decision is reviewed by an appellate court applying an abuse of discretion standard. *Id.* (citing *United States v. Mitchell*, 39 M.J. 131, 144 n. 7 (C.M.A.1994)).

### C. Discussion

In this case, the initial recusal decision of Senior Judge Geiser was set aside as an abuse of discretion for not first considering the Code 13 file containing the processing of the appellant's ethics complaint. Rather than return this matter for a more informed decision by the cognizant judge, our superior

court directed a new panel to review the Code 13 file, and then to rule on the appellant's motions.

It is readily apparent that the central issue on appeal in this case has shifted from the fairness of the appellant's trial to a determination of the ethical propriety of a member of this court participating in review of the case. Mindful of our duty to sometimes make difficult decisions, at this juncture in this case—its third appellate review and more than four years after trial—we find substantially more benefit to the parties and to this court in refocusing on the assignments of error, than in continuing to weigh and parse the subtleties of disqualification under the circumstances presented in this record.[3] We, therefore, grant the appellant's motion to reconsider as a matter of our discretion. CCA Rule 19. The motion to recuse is moot.

We now move to address the appellant's original assignments of error. We will do so in chronological order, rather than the order in which the errors were alleged.

## II. Unlawful Command Influence

The appellant alleges unlawful command influence (UCI) through the intimidation of Mr. Foster, a defense witness. The appellant asserts that LT C unlawfully coerced Mr. Foster into recanting a truthful and exculpatory statement, thereby depriving the appellant of the defense of an innocent ingestion. This, the appellant says, was accomplished by LT C threatening Mr. Foster and by providing a copy of Mr. Foster's affidavit to local policeman LT Asher, whom the appellant argues also coerced Mr. Foster with threats of prosecution at the behest of LT C. We find no merit in these assertions.

### A. Principles of Law

▇▇▇ It is clear the law condemns any UCI directed against prospective witnesses at a court-martial. *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F.2004); *United States v. Newbold*, 45 M.J. 109, 111 (C.A.A.F.1996); *United States v. Stombaugh*, 40 M.J. 208, 212 (C.M.A.1994). When UCI is directed against prospective defense witnesses, it "transgresses the accused's rights to have access to favorable evidence," thus depriving the service member a valuable constitutional right. *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A.1986).

▇▇▇ To prevail on an allegation of UCI on appeal, the appellant must: (1) allege sufficient facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that unfairness. *Stombaugh*, 40 M.J. at 213. Once the appellant has met his initial burden of going forward, the burden of proof shifts to the Government. It must convince the court beyond a reasonable doubt that there was no UCI, or that the UCI did not affect the findings and sentence. *Id.* at 214. In resolving this matter, we will review the findings of the military judge under a clearly erroneous standard, but we will review *de novo* the legal conclusion of whether those facts constitute unlawful command influence through unlawful witness interference. *United States v. Ayers*, 54 M.J. 85, 95 (C.A.A.F.2000).

### B. Discussion

▇▇▇ First, we conclude that the military judge's findings of fact are supported by the record. We also note that these findings are not challenged by the parties. We, therefore, adopt them as our own.[4] Appellate Exhibit LVIII. The military judge found that Mr. Foster initially provided a sworn affidavit to LT C in which he admitted putting methamphetamine into the appellant's drink. Under these facts, we agree with the

3. This court could certainly have disposed of the recusal issue definitively; but, we do not believe we could have done so comprehensively without further fact-finding. Delaying disposition of this case while additional facts were gathered, however, is not in the best interests of justice.

4. The military judge's rulings, however, are somewhat imprecise in the articulation of the

legal standard to be applied to a pretrial allegation of UCI. *Compare United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F.1999) with *Stombaugh*, 40 M.J. at 213. We need not discuss these standards at length because we will review his legal conclusions *de novo*, applying the proper standard. *Id.*

military judge that LT C had reason to find this affidavit suspect. It was provided by a friend of the appellant, Mr. Foster, who admitted to criminal wrongdoing, thereby providing the appellant with a defense to the charges preferred against him, at significant risk to Mr. Foster himself. These facts raise the specter of collusion, and LT C's actions to verify the facts contained in the affidavit were proper. LT C properly asked whether Mr. Foster wished an attorney present prior to discussing the affidavit. That question was prudent, if not required, when Government counsel is about to question someone who has just admitted criminal activity. When Mr. Foster declined, the military judge found that LT C had not threatened him with prosecution, or otherwise. There is no evidence that LT C attempted to prevent Mr. Foster from attending either the appellant's administrative discharge board or subsequent court-martial, where Mr. Foster, in fact, testified for the defense.

The record also supports the military judge's finding that LT C later forwarded the affidavit to the police because he could no longer find Mr. Foster, and because it contained admissions of criminal conduct, which fell within the jurisdiction of the civilian police. The military judge found that LT C did not ask policeman LT Asher to coerce Mr. Foster to retract his affidavit. Once Mr. Foster was located, LT Asher accurately advised him that his statement constituted an admission of criminal conduct. Although LT Asher told Mr. Foster that he planned to advance the affidavit to the prosecutor's office, that was a correct statement of the officer's responsibility, and it was neither a threat, nor was it couched in terms of intimidation by which the *quid pro quo* of a retraction was solicited.

Based on the facts as found by the military judge, which we have adopted, we are convinced beyond a reasonable doubt that Mr. Foster retracted the story in his earlier affidavit because it was false. Had the retraction been the product of intimidation, the retraction alone would have sufficed in response. In this case, however, Mr. Foster went well beyond a mere retraction, explain-

ing that he was the appellant's friend, and that he had been offered money by the appellant to make the false statement, and that he believed that he could not get into trouble. Importantly, Mr. Foster then testified at the appellant's court-martial as a defense witness, and was subject to cross-examination. LT Asher also testified. All of the evidence regarding Mr. Foster's two statements was thoroughly explored. The military judge found no UCI was established by the facts of record, and neither do we.

We conclude that, while the appellant may have met his burden of going forward, the evidence shows beyond a reasonable doubt that appellant's allegations of UCI through witness intimidation are not substantiated. This assignment of error is without merit.

## III. Prosecutorial Misconduct

Based on the facts set forth above, the appellant also alleged prosecutorial misconduct. AE LII.

### A. Principles of Law

■ Prosecutorial misconduct is generally defined as "action or inaction by a prosecutor in violation of some legal norm·or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F.1996). Where a military judge has made factual determinations regarding the events surrounding allegations of prosecutorial misconduct, we will accept those determinations unless they are clearly erroneous. *United States v. Rodriguez–Rivera*, 63 M.J. 372, 378 (C.A.A.F.2006). In analyzing allegations of prosecutorial misconduct, "courts should gauge the overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." *Id.* (quoting *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F.2003)).

### B. Discussion

■ We first note that LT C was not the prosecutor in the special court-martial.[5] The appellant focuses on LT C's actions as the Government counsel in the appellant's admin-

5. There is no allegation of misconduct by either of the trial counsel who prosecuted this case.

istrative discharge board proceeding. As we previously noted, the military judge made extensive findings of fact regarding LT C's role, and we have adopted these findings.

The facts have been sufficiently reiterated. It suffices to say that the record supports the military judge's finding that LT C did not threaten or intimidate Mr. Foster. Rather than violating a legal norm or standard, we agree that asking Mr. Foster whether he wanted to consult with counsel before answering questions about his affidavit was prudent, if not required. Thereafter, LT C forwarded the affidavit to the police as a matter under the cognizance of local authorities, as it was his duty to do when that affidavit contained admissions of criminal conduct that were beyond his jurisdiction to address. Finally, the military judge found that LT C had not asked the police to coerce Mr. Foster into changing his story or to discourage his testifying. Mr. Foster did, in fact, testify at trial as a defense witness, fully describing what he did and what he did not do, and subjecting himself to cross-examination.

Based on the foregoing, we conclude the actions of LT C did not constitute prosecutorial misconduct and they had no improper effect on the trial. This assignment of error is without merit.

## IV. Sixth Amendment Right to Confrontation

### A. Principles of Law

At trial, the appellant did not object to the introduction into evidence of the Navy Drug Screening Lab report pertaining to his urinalysis, which tested positive for the presence of methamphetamine. The appellant now contends that the admission of this report and its allied documents violated his Sixth Amendment Right to Confrontation as articulated in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As this error is asserted for the first time on appeal, we will use a plain error analysis. *United States v. Gilley*, 56 M.J. 113, 122 (C.A.A.F.2001). To prevail, the appellant must show: (1) there was an error; (2) it was plain or obvious; and (3) the error

materially prejudiced a substantial right. *United States v. Tyndale*, 56 M.J. 209, 217, (C.A.A.F.2001). If plain error is established, the burden of proof shifts to the Government to prove that any constitutional error was harmless beyond a reasonable doubt. *United States v. Brewer*, 61 M.J. 425, 430 (C.A.A.F.2005).

■ It may generally be stated that *Crawford* held that "testimonial" out-of-court statements are not admissible into evidence unless the witness who made the statement is unavailable, and the accused had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 53–54, 124 S.Ct. 1354. " 'The lynchpin of the *Crawford* decision ... is its distinction between testimonial and nontestimonial hearsay....' " *United States v. Magyari*, 63 M.J. 123, 126 (C.A.A.F.2006)(quoting *United States v. Scheurer*, 62 M.J. 100, 104–05 (C.A.A.F. 2005)). Nontestimonial statements "do not fall within the scope of *Crawford* and may be exempted from Confrontation Clause scrutiny altogether." *Id.* (citing *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354).

The applicability of *Crawford* depends not only "on the meaning of 'testimonial,' but on the circumstances and context in which out-of-court statements are generated, and whether the out-of-court statements were made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial by the government." *Id.* (citing *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354). In assessing the circumstances and context of a random urinalysis, our superior court found that "the better view is that these lab technicians were not engaged in a law enforcement function, a search for evidence in anticipation of prosecution or trial," when they completed lab reports. *Id.*

### B. Additional Facts

After behaving erratically, if not in a bizarre manner, and admitting that he had ingested methamphetamine, the appellant was directed by his command to provide a urine sample. Record at 26. Once obtained, the appellant's urine was forwarded to the Navy Drug Screening Lab, where it was

tested in a batch containing 97 other samples from various commands, and three blind samples. *Id.* at 318. Since each sample was identified by its assigned accession number, the laboratory technician testing them did not know the source command, the identity of the provider, or the basis on which the command had obtained the urine sample. *Id.* at 319–22.

## C. Discussion

Relying on *Magyari*, the appellant contends that the lab results and supporting documentation regarding his positive urinalysis are "testimonial" in nature, were prepared in anticipation of prosecution, and therefore could not have been admitted absent cross-examination of the individuals who prepared the documents and tested the samples. We disagree.

We first acknowledge that in *Magyari*, the lab reports at issue concerned a random urinalysis of multiple individuals at a command, whereas in the case at bar the appellant was singled out by his command and directed to provide the sample. His urine was the only sample sent by his command to the Navy Drug Screening Laboratory, and it was marked "probable cause." Prosecution Exhibit 2. However, while the basis for collecting the samples in these cases differ, those differences do not appear to have altered the method by which the lab technicians tested and reported the results, as compared to those in *Magyari*. The appellant's sample was one among 100, some of which were blind samples provided for quality assurance. The technicians did not associate any sample with a particular person, and they had no expectation that any particular sample would test positive for any particular drug. Finally, as in *Magyari*, the lab technicians testing the appellant's sample had no reason to suspect him of drug use, and no basis upon which to believe that his sample would test positive for methamphetamine.

In *United States v. Harcrow*, 66 M.J. 154 (C.A.A.F.2008), local sheriff's deputies seized drug paraphernalia from Harcrow's residence, and sent the items to the Virginia Division of Forensic Science for analysis. Those items were labeled "probable cause" and tested for drug residue. The reports documenting the presence of cocaine specifically identified Harcrow as the "suspect." As noted by the court in its decision, the facts in *Harcrow* differ markedly from those in *Magyari*. *Id.* at 159. The court had no difficulty in finding the lab reports to be testimonial where they had been requested by the sheriff after arresting Harcrow, and the information relayed on the reports pertained to the items seized during the arrest of an identified suspect. *Id.*

The key to understanding the result in these two cases lies in the court's use of several non-exclusive factors in distinguishing between testimonial and nontestimonial hearsay: (1) whether the statement was elicited by or made in response to law enforcement or prosecutorial inquiry; (2) whether the statement involved more than a routine and objective cataloging of unambiguous factual matter; and (3) whether the primary purpose for making, or eliciting, the statement was the production of evidence with an eye toward trial. *United States v. Rankin*, 64 M.J. 348, 352 (C.A.A.F.2007). In applying these factors, the goal is " 'an objective look at the totality of the circumstances surrounding the statement to determine if the statement was made or elicited to preserve past facts for a criminal trial.' " *Harcrow*, 66 M.J. at 158 (quoting *United States v. Gardinier*, 65 M.J. 60, 65 (C.A.A.F.2007))(citing *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

Applying the *Rankin* factors to the facts at issue here, we find it less than certain that the command elicited the lab test with prosecution in mind. Though the sample was required of the appellant, his command initially opted to use the lab report to support administrative action, rather than prosecution. His subsequent court-martial was the result of his own demand. Similarly, while at some level of administrative control within the lab, the designation of the sample as "probable cause" was known, given the range of options for which a positive lab report might be used by a Navy command, it is less than certain that a "probable cause" designation alone would lead a lab official to believe the report would be used in a crimi-

nal prosecution. Finally in this regard, the prospective witnesses, the technicians, were unaware the sample had been obtained based on probable cause, so they employed the standard urinalysis testing and reporting protocol, just as in *Magyari*, objectively cataloging the facts. Their primary purpose in so doing was the proper implementation of the Navy Lab's drug screening program, not the production of evidence against this appellant for use at trial.

We conclude that the balance of evidence tips towards a conclusion that, despite the initial basis for obtaining the sample, and its label as "probable cause," the lab reports in this case remained a routine, objective cataloging of unambiguous factual matter by the prospective witnesses who prepared the reports. *Magyari*, 63 M.J. at 126–27 (citing *United States v. Bahena–Cardenas*, 411 F.3d 1067, 1075 (9th Cir.2005)). As such they were not "testimonial" in nature as contemplated by *Crawford*, and their admission into evidence did not violate the appellant's Sixth Amendment Right to Confrontation. Furthermore, they were properly admitted under a "firmly rooted hearsay exception" as a business record under MILITARY RULE OF EVIDENCE 803(6), MANUAL FOR COURTS-MARTIAL UNITED STATES (2002 ed.). *Id.* at 128 (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)).

Before leaving this issue, we note that the appellant was observed acting in a bizarre fashion by the police who apprehended him, by members of his command, including a corpsman, and by the civilian hospital employees. The appellant made multiple admissions that he ingested methamphetamine, including statements to the corpsman, his command master chief, and to the civilian medical staff as they worked to diagnose and treat him.[6] In view of the strength of this evidence against the appellant, even if the corroborating lab test was improperly admitted, the error was harmless beyond a reasonable doubt. *Brewer*, 61 M.J. at 432.

## V. Staff Judge Advocate's Recommendation and Clemency

The appellant claims that the failure of the staff judge advocate (SJA) to comment on the appellant's assertion of legal error requires a new staff judge advocate recommendation (SJAR), and that the failure of the convening authority (CA) to consider his clemency requires a new CA's action. We disagree.

The SJAR recommended that the adjudged sentence be approved. On 30 November 2004, the appellant's trial defense counsel filed a clemency request with the CA.[7] That request alludes to prosecutorial misconduct in its recitation of facts, but it does not specifically allege "prosecutorial misconduct" as legal error. Rather, the clemency request asks that the guilty finding be set aside, in the interests of "justice." Even assuming, without deciding, that such a vague clemency request triggered the requirement under RULE FOR COURTS-MARTIAL 1160(d)(4), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2002 ed.) that the SJA comment on these allegations as an assertion of legal error, we find no relief is required.

The CA's action of 14 December 2004 states that the CA considered the record of

---

6. Though the appellant objected at trial to the admission of these statements as involuntary and the product of inadequate counsel rights, in this appeal he does not challenge the ruling of the military judge admitting them. Had he done so, we would review the decision of the military judge under an abuse of discretion standard. *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F.2004)(citing *United States v. Tanksley*, 54 M.J. 169, 175 (C.A.A.F.2000)). "We will not overturn a military judge's evidentiary decision unless that decision was 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.' " *Id.* (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F.1997))(quoting *United States v. Travers*, 25 M.J. 61, 62 (C.M.A.1987)). The findings of the military judge regarding the voluntariness of the appellant's statements are supported by the record and are not clearly erroneous. Based on those facts, the admission of the appellant's statements into evidence was neither an abuse of discretion nor plain error. *Gilley*, 56 M.J. 113, 122.

7. The clemency request notes that the appellant would submit additional matters for consideration by 10 December 2004. However, no additional clemency matter appears in the record, and the appellant did not subsequently submit an affidavit or provide any other matter to this court.

trial and the clemency matters submitted by the accused. The appellant's allegations of Government counsel misconduct were fully litigated and twice denied by two different military judges. The CA, therefore, had all of the information before him upon which to assess the "justice" of the trial. Under these circumstances, we do not reasonably expect that the appellant would have received any benefit had the staff judge advocate specifically commented on, or provided an analysis of, his claims. We, therefore, decline to order a new SJAR or CA's action. *United States v. Hill,* 27 M.J. 293, 297 (C.M.A. 1988)("a Court of Military Review is free to affirm when a defense allegation of legal error would not foreseeably have led to a favorable recommendation by the [SJA] or to corrective action by the [CA]"). *See also* R.C.M. 1106(d)(6).

## VI. Post Trial Delay

### A. Principles of Law

 We initially analyze claims of excessive post-trial delay as a due process matter. In determining whether there has been a constitutional violation, we employ the analytical framework provided by our superior court. *United States v. Moreno,* 63 M.J. 129, 135 (C.A.A.F.2006); *United States v. Jones,* 61 M.J. 80, 83 (C.A.A.F.2005)(citing *Toohey v. United States (Toohey I),* 60 M.J. 100, 102 (C.A.A.F.2004)). If the length of the delay is "facially unreasonable," we then balance the length of the delay against the three other factors, which include the reasons for the delay, the appellant's demand for speedy review, and prejudice. *Moreno,* 63 M.J. at 135 (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).[8] Moreover, in extreme cases, the delay itself may " 'give rise to a strong presumption of evidentiary prejudice.' " *Id.* (quoting *Toohey I,* 60 M.J. at 102). If no constitutional violation is established, we then analyze the delay under our broad Article 66(c), UCMJ, man-

date. *United States v. Brown,* 62 M.J. 602, 607 (N.M.Ct.Crim.App.2005)(en banc).

### B. Additional Facts

The appellant was sentenced on 15 January 2004, but brought a post-trial motion for unlawful command influence on 3 February 2004. His post-trial motion was heard on 12 March 2004, and the military judge ruled on that motion on 2 July 2004. The record of trial was authenticated on 28 October 2004, and the CA took action on 14 December 2004. The case was docketed with this court on 3 February 2005. After eleven defense enlargements, the appellant filed his initial brief on 27 June 2006. Initial appellate review was completed on 24 January 2007. Remand of this matter was ordered on 31 December 2007, and it was redocketed with this court on 17 January 2008.

### C. Discussion

In assessing post-trial delay in this case, we note the following facts: (1) the action of the convening authority was not taken within 120 days of completing the appellant's trial on 2 July 2004, and this was 334 days after sentencing; (2) the record of trial was not timely docketed at this court on 3 February 2005, but 20 days beyond the expiration of the 30–day presumption period established for cases tried after *Moreno;* (3) initial appellate review was completed on 24 January 2007, six months after the appellant filed his Brief and Assignments of Error, after eleven defense enlargements; nevertheless, this was almost six months beyond the 18–month period which is now presumptively unreasonable (*See Moreno,* 63 M.J. at 142); and (4) this opinion is issued approximately seven months after redocketing this matter following remand by our superior court.

 The delay in three of the four periods described above would be sufficient to trigger a presumption of unreasonable delay in a post-*Moreno* case.[9] Aside from *Moreno*

---

8. Since the appellant's case was tried prior to the decision in *Moreno,* the presumptions of unreasonable delay articulated in that case do not apply. Nevertheless, we find those presumptions instructive.

9. Considering the number of errors assigned and the length of the record, which now measures five-volumes, we view as reasonable the seven months required for a second panel of this court to review this case anew following remand.

as guidance, we find the delay in docketing this case 385 days after sentencing to be facially unreasonable, even allowing a reasonable time to litigate the appellant's post-trial motion. As a result, we will next balance the length of delay against the other three factors articulated above. *Jones,* 61 M.J. at 83.

In assessing the reasons for the delay in this case, we do not accept that the appellant's post-trial motion contributed to the delay. That motion was filed and heard within 60 days of sentencing. Given the length of the transcript being prepared, it is unlikely that this motion delayed the preparation of the record. Furthermore, nothing explains the need of the military judge to consume nearly four months to rule on the motion and, even if adequately explained, there is no reason articulated why the transcript—even a substantial 727-page transcript—was not completed for nearly an additional four months; ten months from the date of sentencing. As well, once the convening authority had taken action, the delay in forwarding this case to this court is unexplained. This is "the least defensible of all" post-trial delays. *United States v. Dunbar,* 31 M.J. 70, 73 (C.M.A.1990). The reasons for these delays, we conclude, weigh in favor of the appellant.

Quite a substantial period of delay occurred after docketing with this court. Much of this delay was consumed by eleven enlargements granted at the request of the appellant's military defense counsel. We do not hold the appellant "responsible for the lack of 'institutional vigilance' which should have been exercised in this case." *Moreno,* 63 M.J. at 137 (quoting *Diaz v. Judge Advocate General of the Navy,* 59 M.J. 34, 39–40 (C.A.A.F.2003)); and, we recognize that "the timely management and disposition of cases docketed" before this court is our responsibility. *Id.* We, therefore, conclude this period weighs slightly in favor of the appellant.

Next, we note that the appellant only asserted his right to a speedy review of his trial two and one-half years after sentencing, when his counsel filed his first brief with this court on June 27, 2006.[10] This weighs against the appellant, but not heavily. *Unit-*

*ed States v. Harvey,* 64 M.J. 13, 24 (C.A.A.F. 2006); *Moreno,* 63 M.J. at 138. Finally, the appellant has not asserted any prejudice as a result of this delay other than a speculative claim, contingent on our finding merit in one or more of his assignments of error. Our review of the record has also failed to reveal any prejudice to the appellant as a result of delay in this case. In particular, we note that even if this case had received the most timely of post-trial processing, the appellant would have served all of his three months of confinement before the convening authority could reasonably have taken his action. Finally, though some of the periods of delay in the course of post-trial processing in this case indicate an unacceptable lack of professional urgency, we do not find the delay to have been so egregious as to give rise to a presumption of prejudice. *United States v. Toohey (Toohey II),* 63 M.J. 353, 362 (C.A.A.F.2006). Carefully weighing all four of the *Jones* factors listed above, we conclude that there has been no violation of the appellant's constitutional due process guarantees.

Finding no constitutional violation, we next turn to the question of whether the findings and sentence in this case should be approved under Article 66(c), UCMJ. We again consider the four factors set forth in *Jones,* the factors we explained in *United States v. Brown,* 62 M.J. 602 (N.M.Ct.Crim.App. 2005)(en banc), as well as the guidance of our superior court in *Toohey I,* and *United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F. 2002). We find that the post-trial delay in this case does not impact the findings or the sentence that "should be approved" and we decline to grant relief. *See* Art. 66(c), UCMJ.

### Conclusion

Accordingly, the prior opinion of this court is vacated. The findings of guilty and the sentence, as approved by the CA, are affirmed in accordance with this opinion.

Senior Judge VINCENT and Judge COUCH concur.

---

10. The appellant also filed a motion for expedit-
ed review on 5 June 2008, which we denied.